[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12623
Non-argument calendar
_____


In re: JOHN RUTHELL HENRY,

Petitioner.


_____

Middle District of Florida
_____

(June 17, 2014)

Before MARCUS, PRYOR, and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner John Ruthell Henry, a Florida prisoner scheduled to be executed at 6:00 p.m. on June 18, 2014, has just filed with this Court an emergency application for leave to file a second or successive federal habeas corpus petition based on 28 U.S.C. § 2244(b) and the United States Supreme Court's recent decision in Hall v. Florida, 134 S. Ct. 1986 (2014). He also seeks a stay of execution pursuant to 28

U.S.C. § 2251.  Henry alleges that he is intellectually disabled and, therefore, cannot be executed consistent with the command of the Eighth Amendment ban on cruel and unusual punishment.

After thorough review, we deny the application because Henry cannot circumnavigate the stringent requirements for leave to file a second or successive petition found in § 2244(b).  His petition fails for two independent reasons: first, the rule enunciated in Hall v. Florida has not been made retroactive by the United States Supreme Court; moreover, even if it had been, he has not shown a reasonable likelihood that he would benefit from the rule in Hall.

The essential facts and relevant procedural history are these.  Shortly before Christmas 1985, Petitioner went to Pasco County to speak to his estranged wife Suzanne Henry.  Before he arrived, he had smoked crack cocaine.  The couple began to argue during his visit, and the dispute ended when Henry killed Suzanne by stabbing her repeatedly in the throat at least thirteen times.  The petitioner told investigators that Suzanne initially grabbed the knife to stab him; but he overpowered her, secured the knife, and then killed her.  He then took Eugene Christian -- Suzanne's five-year old son from another marriage -- to Hillsborough County.  Hours later, Henry killed Eugene by repeatedly stabbing him in the

2

throat.[1]

Henry was convicted of the first-degree murder of Suzanne and received a sentence of death. The Florida Supreme Court, however, reversed his conviction and sentence. Henry v. State, 574 So. 2d 73 (Fla. 1991) (per curiam). Henry was tried and convicted again and sentenced to death, and the Florida Supreme Court affirmed the conviction and sentence on direct appeal. Henry v. State, 649 So. 2d 1366 (Fla. 1994) (per curiam), cert. denied, 515 U.S. 1148 (1995). He then sought post-conviction relief under Florida Rule of Criminal Procedure 3.850, but the state courts denied his application. Henry v. State, 862 So. 2d 679 (Fla. 2003) (per curiam). Henry then proceeded to file his first federal petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of Florida. He argued only that counsel had been ineffective; no claim for mental retardation was made. The district court denied his petition and we affirmed. Henry v. Sec'y, Dep't of Corr., 490 F.3d 835 (11th Cir. 2007) (per curiam).[2]

---

[1] Ten years before Petitioner's 1985 murder of Suzanne and Eugene, Petitioner was convicted of second degree murder for killing his first wife, Patty, also by repeatedly stabbing her in the throat. Henry v. Sec'y, Dep't of Corr., 490 F.3d 835, 837 n.2 (11th Cir. 2007) (per curiam).

[2] Henry was also convicted and sentenced to death for the murder of Eugene Christian, and once again, the Florida Supreme Court reversed on direct appeal and remanded for a new trial. Henry v. State, 574 So. 2d 66 (Fla. 1991) (per curiam). But just as in this case, Henry was convicted of first degree murder and sentenced to death for Eugene's murder in a second trial. Both the conviction and the sentence were affirmed. Henry v. State, 649 So. 2d 1361 (Fla. 1994) (per

Henry is set to be executed for the murder of Suzanne Henry on Wednesday, June 18, 2014, at 6:00 p.m. under a death warrant that Governor Scott signed on May 2, 2014. On May 5, the Florida Supreme Court issued a scheduling order that set a deadline of May 19 by which time all proceedings were to be completed in state circuit court. The next day, May 6, a Florida circuit court in Pasco County issued a scheduling order that directed Henry to file any postconviction motion by Friday, May 9.

Henry's counsel opted not to file any petition for collateral relief in the state circuit court. Instead, on May 7, Henry's counsel formally asked the Governor to authorize a determination of Henry's sanity, and thus his fitness for execution, as provided in § 922.07 of the Florida Statutes.[3] On May 12, Governor Scott granted

---

curiam), cert. denied, 516 U.S. 830 (1995). The denial of post-conviction relief was also affirmed. Henry v. State, 948 So. 2d 609 (Fla. 2006) (per curiam). Henry's federal petition for a writ of habeas corpus challenging the validity of his conviction for murdering Eugene Christian was denied by the United States District Court in the Middle District of Florida on February 4, 2011. Henry v. McDonough, No. 8:07–cv–406–T–23TBM, 2011 WL 397939 (M.D. Fla. Feb. 4, 2011). Henry's current application for leave to file a second or successive habeas petition does not concern his conviction and sentence for the murder of Eugene.

[3] In relevant part, § 922.07 states:

> (1) When the Governor is informed that a person under sentence of death may be insane, the Governor shall stay execution of the sentence and appoint a commission of three psychiatrists to examine the convicted person. The Governor shall notify the psychiatrists in writing that they are to examine the convicted person to determine whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her. . . .

Henry's request and appointed a panel of three psychiatrists.  The panel of mental health experts submitted a report to the Governor that concluded "with reasonable medical certainty that (1) Mr. Henry does not suffer from any DSM-5 psychiatric illness or intellectual disability (formerly referred to as mental retardation in DSM-IV), and (2) understands the nature and effect of the death penalty and why it is imposed on him."  Thereafter, in Executive Order 14-169, signed on May 20, Governor Scott dissolved the temporary stay of execution, which left the death warrant "in full force and effect."

On May 27, 2014, the United States Supreme Court decided Hall v. Florida, concluding that a State cannot execute a person whose IQ test score falls within the test's margin of error unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.  134 S. Ct. at 2001.  Under § 921.137 of the Florida Statutes as interpreted by the Florida Supreme Court, a prisoner sentenced to death previously had been required to

---

> (2) After receiving the report of the commission, if the Governor decides that the convicted person has the mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him or her, the Governor shall immediately lift the stay and notify the Attorney General of such action. . . .
>
> (3) If the Governor decides that the convicted person does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him or her, the Governor shall have the convicted person committed to a Department of Corrections mental health treatment facility.

Fla. Stat. § 922.07.

5

show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability.[4]  See Hall v. State, 109 So. 3d 704, 707 (Fla. 2012) (per curiam); Cherry v. State, 959 So. 2d 702, 712-13 (Fla. 2007) (per curiam).  The strict 70 IQ score cut-off did not take into account the standard error of the test.  The Supreme Court in Hall struck down Florida's cut-off as violating the Eighth Amendment's prohibition on cruel and unusual punishment because the rule "misuse[d] IQ score on its own terms" in a way that risked the execution of those with intellectual disabilities.  134 S. Ct. at 2001.  Because "an IQ test score represents a range rather than a fixed number," the Court observed that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."  Id.  Thus, in Hall, the Supreme Court concluded that because of a +/- 5 standard of error, "an individual with an IQ test score 'between 70 and 75 or lower' . . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive

_____

[4] In relevant part, § 921.137 provides:

> [T]he term "intellectually disabled" or "intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test . . . .

Fla. Stat. § 921.137(1).

6

functioning." Hall, 134 S. Ct. at 2000 (quoting Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002)). Soon thereafter, based on this new Supreme Court law, on Friday, May 30, Henry's counsel filed in Florida circuit court a Defense Motion for Determination of Intellectual Disability as a Bar to Execution, pursuant to Florida Rule of Criminal Procedure 3.203(c).[5] Henry claimed that he scored 78 on an IQ test in 1986,[6] but he alleged that evidence showed "significant limitations in his adaptive functioning that reduce his overall functioning to that of a person with an IQ of less than 70." Henry pointed to his abusive childhood, which caused cognitive deficits; his family history of mental illness; and testimony that, despite his then-chronological age of 35, Henry had a mental/developmental age

---

[5] In relevant part, Rule 3.203 states:

> (c) Motion for Determination of Intellectual Disability as a Bar to Execution: Contents; Procedures.
>
> (1) A defendant who intends to raise intellectual disability as a bar to execution shall file a written motion to establish intellectual disability as a bar to execution with the court. . . .
>
> (d) Time for filing Motion for Determination of Intellectual Disability as a Bar to Execution. The motion for a determination of intellectual disability as a bar to execution shall be filed not later than 90 days prior to trial, or at such time as is ordered by the court. . . .
>
> (f) Waiver. A claim authorized under this rule is waived if not filed in accord with the time requirements for filing set out in this rule, unless good cause is shown for the failure to comply with the time requirements.

Fla. R. Crim. P. 3.203.

[6] The Florida Supreme Court states that this test occurred in 1987.

7

equivalent to a 13 or 14 year-old due to poor adaptive functioning.  Henry asked the state circuit court: to authorize a determination of mental disability by two experts; to hold an evidentiary hearing to consider their findings and all other evidence on the issue of intellectual disability; to stay Henry's execution pending the outcome of the proceedings; and ultimately to find Henry intellectually disabled and ineligible for the death penalty.

The Florida circuit court denied Henry's motion as being untimely later that day, explaining that it came after the May 19 deadline for trial court filings established by the Florida Supreme Court.  Henry appealed to the Florida Supreme Court, arguing that the May 19 deadline applied only to pending motions, not Henry's new claim based on Hall.  Henry asked that the Florida Supreme Court reverse the state circuit court order and remand for a post-Hall determination of whether Henry is intellectually disabled.  The Florida Supreme Court denied the appeal on the merits on June 12, concluding that Henry was not entitled to an evidentiary hearing because he had not demonstrated a facially sufficient claim of intellectual disability.  The court found that, beyond the assertion of his 78 IQ test score, Henry had not alleged any deficits in adaptive functioning or onset prior to age 18.  Moreover, the Florida Supreme Court observed that throughout the lengthy litigation of this case not a single doctor had ever opined that Henry was mentally retarded or intellectually disabled.  And, indeed, the psychiatrists who

8

had recently examined Henry at the Governor's direction found no intellectual disability: "[h]is clinical presentation during the evaluation was consistent with intellectual functioning at or above what would be predicted based on his prior IQ test result of 78 (7th percentile)." The psychiatrists also noted that Henry "was able to discuss the legal process accurately in reasonable depth" and "correctly serially subtracted seven from 100 on four of five steps (100-93-79-73-56)." The Florida Supreme Court added that the record did not evince a showing that Henry had adaptive functioning deficits: "Henry was able to drive a car, develop personal relationships, participate in financial transactions, discuss adult concepts, and engage in goal-directed behavior." Indeed, that court remarked that Henry's pro se pleadings and oral advocacy demonstrated his effective oral and written communication skills and his understanding of the law.[7]

---

[7] In the meantime, on June 5, 2014, this Court received a pro se letter from Henry that asked all members of the Court to stay his execution on the ground that he was tried by a jury made up of "a majority of white [rather] than persons of color." The letter requested that this Court should require that all juries be composed of "6 whites" and "6 person[s] of color," and asked that we vacate his death sentences. Pursuant to our longstanding rules, "[w]hen a party is represented by counsel, the clerk may not accept filings from the party." 11th Cir. R. 25-1. Therefore, we did not accept Henry's letter because he had an attorney who was, and is, actively representing him in attempting to stay and vacate the death sentence. Moreover, had we accepted the letter as a pro se filing, we would have been compelled by 28 U.S.C. § 2244 to deny it as a motion for leave to file a second or successive habeas petition. He did not rely on any new rule of constitutional law, the factual predicate of his claim was not previously undiscoverable, and the facts underlying the claim would not have established by clear and convincing evidence that no reasonable factfinder would have found him guilty of homicide. See 28 U.S.C. § 2244(b)(2). Finally, any ruling that addressed the claims raised in the letter would have limited his ability to now claim Hall v. Florida set out a new rule of constitutional law unavailable at the time of his most recent habeas application.

Henry has now moved this Court for leave to file a second or successive petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida pursuant to § 2244 arguing that the Supreme Court's recent decision in Hall marks a change in the law respecting claims of intellectual disability and compels the conclusion that he should be given leave to further address his intellectual disability.  "AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications."  Tyler v. Cain, 533 U.S. 656, 661 (2001); see Gilbert v. United States, 640 F.3d 1293, 1311 (11th Cir. 2011) ("If second and successive motions are not 'greatly restrict[ed],' there will be no end to collateral attacks on convictions and sentences, and there will be no finality of judgment." (quoting Tyler, 533 U.S. at 661)).  Before an applicant may file a second or successive habeas corpus application under § 2254 in the district court, he must move in the appropriate Circuit Court of Appeals for an order authorizing the district court to consider the application.  28 U.S.C. § 2244(b)(3)(A).[8]  A three-judge panel of the

---

[8] In relevant part, § 2244(b) states:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless --

10

Court of Appeals "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of [§ 2244(b)]." Id. § 2244(b)(3)(C). An applicant must show either (A) "that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (B) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and that "the facts underlying the claim, if proven and viewed in light of the evidence as a

---

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)    (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

28 U.S.C. § 2244(b).

11

whole, would be sufficient to establish by clear and convincing evidence that, but

for constitutional error, no reasonable factfinder would have found the applicant

guilty of the underlying offense." Id. § 2244(b)(2).  Henry does not argue for relief

based on the second prong.  And he cannot satisfy the first because his claim is not

based on a new rule of constitutional law made retroactive to cases on collateral

review by the Supreme Court.[9]

---

[9] The dissenting opinion suggests that we ought not to address the retroactivity question because we do not need to, the timing is short, and the state has not responded to the application.  We disagree.  First, we do not see how we can fairly avoid addressing the stringent statutory requirements erected by Congress.  After all, the legislature has placed this burden squarely on the petitioner, who has already filed one federal habeas corpus petition.  Thus, before deciding whether a petitioner has shown a reasonable likelihood of benefiting from a rule, we are obliged to address the statutory command and decide whether that rule was "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2244(b)(2)(A).  Indeed, we can find no circuit case where an appellate court has avoided addressing in any way the statutory retroactivity requirement found in § 2244(b)(2), and instead simply decided the case on whether an applicant put forward "a sufficient showing of possible merit."  In re Holladay, 331 F.3d at 1173 (quoting Bennett, 119 F.3d at 469).  The overwhelming majority of circuit cases have only addressed the application of the new rule and retroactivity requirements to the petitioner' pleadings.  In some instances, the courts have also looked for possible merit.  See, e.g., id.  But never, as best we can tell, has a federal court of appeals avoided any mention of the petitioner's statutory obligations.

As the dissenting opinion sees the case, Henry should be entitled to file a second or successive petition under § 2244(b)(2) because he's made a sufficient merits showing.  However, even if we were to agree with that result, we would still be required to answer the statutory requirements of § 2244(b)(2), since Congress has made clear that a petitioner is not entitled to file any second or successive petition without meeting those statutory obligations.

As for timing, we are required to address the questions raised in this case promptly because Henry's execution has been set for Wednesday, June 18, 2014, at 6:00 p.m, and because he just filed his application for leave to file a second or successive petition on Saturday, June 14, even though the execution is taking place nearly 29 years after the murder.  What's more, this Court necessarily must apply § 2244(b)(2) under a tight time limit in all cases, since the statute expressly requires us to resolve this application within 30 days, no matter the case.  See 28

12

A case announces a new rule of constitutional law when it breaks new ground or imposes a new obligation on the States or the Federal government. Teague v. Lane, 489 U.S. 288 (1989). Put another way, a case announces a new rule if the result was not dictated by precedent existing when the defendant's conviction became final. Id. at 301; see Desist v. United States, 394 U.S. 244, 263 (1969) (Harlan, J., dissenting) (distinguishing between "whether a particular decision has really announced a 'new' rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law").

In Hall, the Supreme Court concluded that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error," the Constitution's Cruel and Unusual Punishment Clause requires that "the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Hall, 134 S. Ct. at 2001. Hall did indeed

---

U.S.C. § 2244(b)(3)(D) ("The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.").

Nor do we think it is a satisfying answer to refuse to address the requirements laid out in the statute because the petitioner has not met his burden, let alone because he has not even attempted to answer whether Hall was made retroactive by the Supreme Court. Nor should we avoid the issue because the state has not filed a response to Henry's § 2244 application, since the state typically does not respond to these kinds of applications. Nor, finally, would we expect the Florida Supreme Court to have addressed whether the Supreme Court made the rule announced in Hall retroactive to cases on collateral review because the state court is in no way required to engage in the second or successive federal habeas analysis embodied in § 2244.

announce a new rule of constitutional law.[10]  Previously, in Atkins, the Supreme Court prohibited the execution of the intellectually disabled, but "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."  536 U.S. at 317 (second alteration in original) (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)).  For the first time in Hall, the Supreme Court imposed a new obligation on the states not dictated by Atkins because Hall restricted the states' previously recognized power to set procedures governing the execution of the intellectually disabled.  In addition, Justice Kennedy's Hall opinion explained that the basis for its holding stretched beyond Atkins alone: "[T]he precedents of this Court 'give us essential instruction,' . . . but the inquiry must go further. . . . In this Court's independent judgment, the Florida statute, as interpreted by its courts, is unconstitutional." Hall, 134 S. Ct. at 1999-2000 (quoting Roper v. Simmons, 543 U.S. 551, 564 (2005)).  Nothing in Atkins dictated or compelled the Supreme Court in Hall to limit the states' previously recognized power to set an IQ score of 70 as a hard cut-off.  This is plainly a new obligation that was never before imposed on the states,

---

[10] The dissent doubts that Hall is even a new rule.  These doubts should have ended the inquiry -- after all, Henry cannot satisfy the first requirement of § 2244(b)(2)(A) unless he can establish that Hall is a new rule.  Moreover, if the rule announced in Hall was already contained within Atkins, then Henry would lose on yet another ground articulated by the statute -- Henry would not be able to argue that the Hall rule was "previously unavailable."  28 U.S.C. § 2244(b)(2)(A).  Rather, he would have been required to bring this claim in his original habeas petition, which he filed in 2004, substantially after Atkins had been decided in 2002.

14

under the clear language of <u>Atkins</u>, and of <u>Hall</u> itself.

But Henry is not entitled to leave to file a second or successive petition because the Supreme Court has not made the new rule announced in <u>Hall</u> retroactive to cases on collateral review. Thus, he simply cannot meet the requirements set by Congress. <u>See</u> 28 U.S.C. § 2244(b)(2)(A). Indeed, the petitioner has made no argument that <u>Hall</u> was made retroactive by the Supreme Court. In <u>Tyler v. Cain</u>, Justice Thomas writing for a plurality of four justices concluded that "[b]ased on the plain meaning of the text read as a whole, . . . 'made' means 'held' and, thus, the requirement is satisfied only if th[e Supreme] Court has held that the new rule is retroactively applicable to cases on collateral review." <u>Id.</u> at 662. Under this interpretation, the petitioner cannot satisfy the requirements embodied in § 2244(b)(2)(A). It is undeniable that the rule pronounced by the Supreme Court in <u>Hall</u> was not made retroactive to cases on collateral review. <u>Hall</u> made no mention of retroactivity. Nor has any subsequent Supreme Court case addressed the issue, much less made <u>Hall</u> retroactive. Unlike this case, <u>Hall</u> did not arise in the context of federal habeas review.[11]

---

[11] The dissent gleans from the procedural posture of <u>Hall</u> that the Supreme Court <u>meant</u> for the rule in <u>Hall</u> to apply retroactively. But in <u>Hall</u>, the Supreme Court granted certiorari to review the denial of <u>state</u> collateral relief. And of course the Supreme Court applied the rule in <u>Hall</u> to Hall himself. After all, he asked the Supreme Court to overturn the Florida procedures for determining an intellectual disability when he petitioned the Court to review the denial of state postconviction relief. Importantly, the Supreme Court was not sitting as a court of federal habeas review. And we can divine no intent of the Court to apply the rule in <u>Hall</u> retroactively

15

Also in <u>Tyler v. Cain</u>, Justice O'Connor in a concurring opinion further explained that the Supreme Court could make a new rule retroactive to cases on collateral review "through multiple holdings that logically dictate the retroactivity of the new rule."  533 U.S. at 668 (O'Connor, J., concurring); <u>see</u> <u>id.</u> ("[I]f we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it

_____

for future federal habeas petitioners nationwide.  <u>Cf.</u> <u>Danforth v. Minnesota</u>, 552 U.S. 269, 275, 280-81 (2008) ("Neither <u>Linkletter</u> nor <u>Teague</u> explicitly or implicitly constrained the authority of the States to provide remedies for a broader range of constitutional violations than are redressable on federal habeas.").

Only when the Court has clearly dictated that a rule is retroactive will we so recognize it for purposes of § 2244(b)(2).  If the Supreme Court has not held a rule to be retroactive to cases on collateral review, we decline to engage in a complicated retroactivity analysis that Congress and the Court have instructed us to avoid.  <u>See</u> <u>Tyler v. Cain</u>, 533 U.S. at 664 ("The court of appeals must make a decision on the application within 30 days.  In this limited time, the court of appeals must determine whether the application 'makes a prima facie showing that [it] satisfies the [second habeas standard].'  It is unlikely that a court of appeals could make such a determination in the allotted time if it had to do more than simply rely on Supreme Court holdings on retroactivity.  The stringent time limit thus suggests that the courts of appeals do not have to engage in the difficult legal analysis that can be required to determine questions of retroactivity in the first instance." (alterations in original) (citations omitted)).  To the extent the dissent explains that <u>Hall</u> <u>should</u> be retroactive, these normative arguments are irrelevant under the statute.  <u>See</u> <u>id.</u> at 668 (O'Connor, J., concurring).  The Supreme Court must have "made" a new rule retroactive before Henry may file a second habeas petition.  <u>Id.</u>

For the same reason, <u>Teague</u> retroactivity analysis does not tell us whether the Supreme Court has made a new rule retroactive to cases on collateral review for purposes of § 2244(b)(2).  <u>See</u> <u>In re Dean</u>, 375 F.3d at 1290 ("It is not enough that a new rule of constitutional law is applied retroactively by this Court or that it satisfies the criteria for retroactive application set forth by the Supreme Court in <u>Teague v. Lane</u>, 489 U.S. 288 (1989).").  As we see it, the dissent has failed to appreciate the procedural posture of the matter before us.  Henry has filed an application to file a second or successive petition.  That motion is governed by 28 U.S.C. § 2244(b)(2)(A), not <u>Teague</u>.

16

necessarily follows that the given rule applies retroactively to cases on collateral review."). We look to Justice O'Connor's concurring opinion as well because when "no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Thus, like our sister circuit courts, we have recognized "retroactivity by logical necessity" as an alternative method of satisfying § 2244(b). In re Holladay, 331 F.3d 1169, 1172 (11th Cir. 2003); see, e.g., In re Morgan, 713 F.3d 1365, 1368 (11th Cir. 2013); In re Moss, 703 F.3d 1301, 1303 (11th Cir. 2013); see also, e.g., United States v. Redd, 735 F.3d 88, 91 (2d Cir. 2013) (per curiam); In re Zambrano, 433 F.3d 886, 888 (D.C. Cir. 2006); Cannon v. Mullin, 297 F.3d 989, 993 n.3 (10th Cir. 2002); In re Turner, 267 F.3d 225, 228 (3d Cir. 2001).

In In re Holladay, we applied Justice O'Connor's analysis to find that the rule pronounced by the Supreme Court in Atkins was made retroactive for purposes of § 2244(b). See In re Holladay, 331 F.3d at 1172. In doing so, we read Atkins alongside the Court's earlier opinion in Penry v. Lynaugh, 492 U.S. 302 (1989), which stated that a rule prohibiting "the execution of mentally retarded persons . . . would be applicable to defendants on collateral review" because "a

17

new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all." Id. at 330. While Penry did not recognize an Eighth Amendment prohibition on the execution of the intellectually disabled, Atkins later did, holding that "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Atkins, 536 U.S. at 321. Taking the two holdings together, we saw "no question that the new constitutional rule abstractly described in Penry and formally articulated in Atkins is retroactively applicable to cases on collateral review." In re Holladay, 331 F.3d at 1173; accord In re Turner, 637 F.3d 1200, 1203 (11th Cir. 2011) (opinion by the Court); In re Hill, 437 F.3d 1080, 1082 (11th Cir. 2006) (opinion by the panel); see Ochoa v. Sirmons, 485 F.3d 538, 540 n.2 (10th Cir. 2007) (per curiam); Davis v. Norris, 423 F.3d 868, 879 (8th Cir. 2005); In re Morris, 328 F.3d 739, 740 (5th Cir. 2003) (per curiam).

Here, however, no combination of Supreme Court holdings compels the conclusion that Hall is retroactive to cases on collateral review. See In re Dean, 375 F.3d 1287, 1290 (11th Cir. 2004) (opinion by the panel) ("Multiple cases can, together, make a rule retroactive, but only if the holdings in those cases necessarily dictate retroactivity of the new rule." (emphasis added)). Atkins had Penry, but there are no Supreme Court cases here that necessarily dictate that the Hall rule is

18

retroactive. The Supreme Court has never held that a rule requiring procedural protections for prisoners with IQ scores within the test's standard of error would be retroactive. Nor does the Penry principle -- that any rule placing a class of individuals beyond the state's power to execute is retroactive -- apply here because Hall merely provides new procedures for ensuring that States do not execute members of an already protected group. Cf. In re Morgan, 713 F.3d at 1368 (concluding that the Supreme Court had not made the rule in Miller v. Alabama, 132 S. Ct. 2455 (2012), retroactive for purposes of § 2244(b) because the rule did not impose a categorical bar to a type of punishment, but instead "changed the procedure by which a sentencer may impose a sentence of life without parole on a minor"). The Supreme Court made clear in Hall that the class affected by the new rule -- those with an intellectual disability -- is identical to the class protected by Atkins. See Hall, 134 S. Ct. at 1990 ("This Court has held that the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. Atkins, 536 U.S. at 321. . . . [Florida's] rigid rule, the Court now holds, creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional."). Hall did not expand this class; instead, the Supreme Court limited the states' power to define the class because the state definition did not protect the intellectually disabled as understood in Atkins. Hall, 134 S. Ct. at 1986 (looking to Atkins, 536 U.S. at 309 n.5, in reaching the "Court's

19

independent assessment that an individual with an IQ test score 'between 70 and 75 or lower' . . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning").

Moreover, even if we could say, as the dissent suggests, that <u>Hall</u> expanded the class of individuals described in <u>Atkins</u>, it did not categorically place them beyond the power of the state to execute. Instead, <u>Hall</u> created a procedural requirement that those with IQ test scores within the test's standard of error would have the <u>opportunity</u> to otherwise show intellectual disability. <u>Hall</u> guaranteed only a chance to present evidence, not ultimate relief. Therefore, <u>Penry</u> in no way dictated that the rule announced in <u>Hall</u> is retroactive to cases on collateral review. The long and the short of it is that the rule announced by the Supreme Court in <u>Hall</u> has not been made retroactive. In the absence of any such ruling from the United States Supreme Court, we are without power to grant leave to file a second or successive petition.

The petitioner's problem is compounded, however, because even if the Supreme Court had made the rule announced in <u>Hall</u> retroactive to cases on collateral review -- and it has not done so -- we still could not authorize the filing of a second or successive habeas petition because Henry has not made a "sufficient showing of possible merit to warrant a further exploration by the district court." <u>In re Holladay</u>, 331 F.3d at 1173 (quoting <u>Bennett v. United States</u>, 119 F.3d 468, 469

(7th Cir. 1997)).  An applicant must show a reasonable likelihood that he would benefit from the new rule he seeks to invoke in a second or successive petition. Id.; see In re Turner, 637 F.3d at 1205 (requiring that an applicant show a reasonable likelihood that he is mentally retarded before granting leave to file a second or successive habeas petition based on Atkins); In re Hicks, 375 F.3d 1237, 1240 (11th Cir. 2004) (opinion by the Court) (same); see also In re Bowling, 422 F.3d 434, 436 (6th Cir. 2005) (requiring sufficient allegations of fact together with some documentation of mental retardation); In re Morris, 328 F.3d 739 (requiring a showing that the "applicant should be categorized as 'mentally retarded'"); cf. In re Vassell, __ F.3d __, 2014 WL 1779039, at *4 (4th Cir. May 6, 2014) ("[W]hile our primary consideration in reviewing a request for authorization in this kind of case is whether the applicant made the requisite prima facie showing about a new rule of constitutional law, nothing in either § 2255 or § 2244 requires us to ignore other considerations and authorize the filing of a successive § 2255 motion that, for instance, would clearly be time-barred.  The statute, we conclude, simply does not require such an exercise in futility.").  Indeed, without this additional requirement, any prisoner could bring a second or successive petition based on a new constitutional rule made retroactive on collateral review by the Supreme Court, even if it had no bearing on his case.  See In re Holladay, 331 F.3d at 1173 n.1.

Henry does not meet this requirement.  The only record evidence in this case

21

of Henry's IQ comes from a 1986 application of the Wechsler Adult Intelligence Scale, which demonstrated he had a 78 IQ. The rule announced in Hall, however, affords Henry no relief in this case. In Hall, as we've noted, the Supreme Court concluded that because of a +/- 5 standard of error, "an individual with an IQ test score 'between 70 and 75 or lower' . . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Hall, 134 S. Ct. at 2000 (quoting Atkins, 536 U.S. at 309 n.5). The dissent elides around this holding in Hall, and suggests that no matter the IQ score -- be it 75, 78, or presumably even 88 -- a defendant should still be allowed to present evidence about the deficiencies in his adaptive functioning in order to make a claim of intellectual disability. But this is not what Hall says. Hall squarely holds that it is "the Court's independent assessment that an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 134 S. Ct. at 2000; see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-5) 37 (5th ed. 2013) ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65-75 (70 ± 5)"). The Supreme Court never said that a petitioner who could only establish an IQ score of, say, 78 would be entitled

22

anyway to make up the difference with other evidence of deficiencies. See 134 S. Ct. at 1996 ("Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater . . . and so they are not included alongside Florida in this analysis."). The problem petitioner has under Hall is he can point to no IQ test yielding a score of 75 or below. Thus, building in the standard error approach explicated by the Supreme Court in Hall would not entitle Henry to the additional "opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning." Hall, 134 S. Ct. at 2001. The Supreme Court in Hall did not hold that a petitioner like Henry, who only has IQ test scores above 75 (here an IQ score of 78), must have an additional chance to demonstrate intellectual disability by pointing to deficiencies in adaptive skills. At the end of the day, taking into account the standard error of measurement explicated by Hall does not entitle Henry to the opportunity to present additional evidence of an intellectual disability.

Moreover, the record presented to us is very thin. No mental health expert has squarely opined that the petitioner is intellectually disabled, and indeed, in the most recent examination conducted at the request of the petitioner and at the direction of the Governor, three psychiatrists unanimously concluded that Henry suffered from no intellectual disability as defined in DSM-5. Rather, they opined, he had intellectual functioning at or above the level predicted by his 78 IQ test

23

score.[12]

Having concluded that Henry cannot satisfy the stringent requirements found in § 2244(b) for leave to file a second or successive habeas petition, we also deny his motion for a stay from execution.  Title 28 U.S.C. § 2251 supplies four factors we consider: "[W]hether the movant has made a showing of likelihood of success on the merits and of irreparable injury if the stay is not granted, whether the stay would substantially harm other parties, and whether granting the stay would serve the public interest."   In re Holladay, 331 F.3d at 1176 (quoting Bundy v. Wainwright, 808 F.2d 1410, 1421 (11th Cir. 1987)).  However, because Henry has not established any likelihood of success on the merits, the motion for a stay must be denied.

**APPLICATION FOR LEAVE AND MOTION FOR STAY DENIED.**

---

[12] The dissent suggests that despite Henry's IQ score of 78, Henry has made a "prima facie" showing of intellectual disability, even though he admits that he's never been examined by a doctor for purposes of determining his intellectual disability.  See Emergency Motion at 13. However, he has not made any allegation, much less pointed to anything in the record, which claims that any mental health expert has said that he is intellectually disabled.  Regardless of whether or not he has been examined by an expert for this purpose, we would need at least some allegation to this effect to begin to be persuaded.  In any event, this is not the basis for our denial of his application.  Indeed, to the extent the dissenting opinion says that we rely on the state's recent examination to deny Henry's application, we disagree.  Our opinion plainly concludes, first and foremost, that Henry fails to satisfy § 2244(b)(2) because Henry "can point to no IQ test yielding a score of 75 or below," as required by Hall.

MARTIN, J., dissenting:

I write separately to express several objections to the Majority's denial of Mr. Henry's application to file a second or successive habeas petition pursuant to 28 U.S.C. § 2244(b)(2)(A).

I.

As a preliminary matter, I do not think it prudent to decide a complicated retroactivity issue under the pressure of Mr. Henry's imminent execution when it appears unnecessary to do so for his case.  In In re Holladay, 331 F.3d 1169, 1172–73  (11th Cir. 2003), this Court held that in order to make a prima facie showing sufficient to support the filing of a second or successive habeas petition under 28 U.S.C. § 2244(b)(2)(A), the habeas petitioner must satisfy two requirements.  First, the petitioner must satisfy the statutory requirement that "the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  Id. at 1172 (quoting 28 U.S.C. § 2244(b)(2)(A)).  Second, the petitioner must also show that "there is a reasonable likelihood" he is entitled to relief under the new rule.  Id. at 1173.  Here, even assuming the rule in Hall v. Florida, __ U.S. __, 134 S. Ct. 1986 (2014), is retroactive, the Majority holds it "still could not authorize the filing of a second or successive habeas petition because Henry has not made a sufficient showing of

25

possible merit to warrant a further exploration by the district court." Maj. Op. at 20 (quotation marks omitted).

In light of the Majority's conclusion that Mr. Henry cannot prevail in any event, it is simply not necessary for the Court to resolve this retroactivity issue. Indeed, judicial restraint counsels against resolving the important retroactivity issue without the benefit of full briefing. The Florida Supreme Court did not express an opinion on retroactivity in deciding Mr. Henry's case. Neither has the State of Florida, to my knowledge, argued in this Court that the rule is not retroactive. In fact, the State has filed no response to Mr. Henry's application. Further, the retroactivity issue is one of first impression that has not been addressed by any Court, state or federal, since the Supreme Court only decided Hall about three weeks ago. I would not decide it here.

## II.

Judicial modesty is uniquely appropriate here also because the Majority's conclusion that the Supreme Court intended its rule in Hall to apply prospectively only and not to cases on collateral review is doubtful for several reasons. First, the Majority ignores the fact that Hall was decided in the collateral review context. Second, the Majority overlooks the substantive nature of the rule announced in Hall and treats it as merely procedural. Third, the Majority errs by concluding that

26

"no combination of Supreme Court holdings compels the conclusion that <u>Hall</u> is retroactive to cases on collateral review." Maj. Op. at 18.

A.

The Majority fails to take into consideration the important procedural context of the Supreme Court's decision in <u>Hall</u>. It is important to keep in mind that the United States Supreme Court in <u>Hall</u> was reviewing a decision of the Florida Supreme Court denying collateral relief long after the defendant's case became final on direct review.[1] To the extent that <u>Hall</u> announced a new rule of constitutional criminal procedure, the fact that the Supreme Court was reviewing a collateral proceeding supports the conclusion that the Justices intended their

[1] The petitioner in <u>Hall</u> committed his crimes on February 21, 1978. <u>Hall</u>, 134 S. Ct. at 1990. His conviction and sentence were affirmed on direct appeal by the Florida Supreme Court on July 16, 1981. <u>Hall v. State</u>, 403 So. 2d 1321 (Fla. 1981) (per curiam). Mr. Hall subsequently filed a state postconviction motion that was denied by the state trial court, and the Supreme Court of Florida affirmed. <u>Hall v. State</u>, 420 So. 2d 872 (Fla. 1982) (per curiam). He then sought and was eventually denied federal habeas corpus relief in 1986. <u>See</u> <u>Hall v. Wainwright</u>, 805 F.2d 945 (11th Cir. 1986) (per curiam). However, Mr. Hall later filed a second motion for state postconviction relief which led the Florida Supreme Court to rule that he had been subjected to a <u>Hitchcock v. Dugger</u>, 481 U.S. 393, 107 S. Ct. 1821 (1987), error. <u>Hall v. State</u>, 541 So. 2d 1125, 1128 (Fla. 1989) (per curiam). On resentencing Mr. Hall was again sentenced to death and his death sentence was affirmed by the Florida Supreme Court in 1993. <u>Hall v. State</u>, 614 So. 2d 473 (Fla. 1993) (per curiam). His direct appeal then became final on October 4, 1993, when the United States Supreme Court denied his petition for writ of certiorari. <u>Hall v. Florida</u>, 510 U.S. 834, 114 S. Ct. 109 (1993); <u>see also</u> <u>Clay v. United States</u>, 537 U.S. 522, 527, 123 S. Ct. 1072, 1076 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). Mr. Hall then sought state postconviction relief in the state trial court which was denied, and the Florida Supreme Court affirmed this denial of relief in 1999. <u>Hall v. State</u>, 742 So. 2d 225 (Fla. 1999) (per curiam). The Florida Supreme Court also denied his habeas corpus petition, <u>Hall v. Moore</u>, 792 So. 2d 447 (Fla. 2001) (per curiam), and the Supreme Court denied certiorari in February 2002, <u>Hall v. Moore</u>, 534 U.S. 1136, 122 S. Ct. 1082 (2002).

27

holding in <u>Hall</u> to apply retroactively to all cases on collateral review.  Before discussing retroactivity, though, I pause to express my doubts about whether the rule announced in <u>Hall</u> is even a "new rule" within the meaning of <u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060 (1989)—the Supreme Court's seminal decision on the retroactivity of new rules of constitutional criminal procedure to cases on collateral review.

The Majority says that <u>Hall</u> did announce a new rule.  Maj. Op. at 13–14.  But the Supreme Court has taught us that "[i]t is admittedly often difficult to determine when a case announces a new rule."  <u>Teague</u>, 489 U.S. at 301, 109 S. Ct. at 1070.  "In general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government."  <u>Id.</u>  "To put it differently, a case announces a new rule if the result was not <u>dictated</u> by precedent existing at the time of the defendant's conviction became final."  <u>Id.</u>  Section C of the Supreme Court's <u>Hall</u> decision states that <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S. Ct. 2242 (2002) "itself acknowledges the inherent error in IQ testing."  <u>Hall</u>, 134 S. Ct. at 1998.  While the Supreme Court acknowledged "that <u>Atkins</u> did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation falls within the protection of the Eighth Amendment," id. (quotation marks omitted), it noted that <u>Atkins</u> itself "twice cited definitions of intellectual disability which, by their express terms, rejected a strict

28

IQ test score cutoff at 70," id.  It occurs to me, therefore, that the decision in Hall did not announce a new rule insofar as the result was dictated by Atkins.

By the same token, if Atkins is retroactively applicable to cases on collateral review—and that conclusion is beyond any debate—then the Supreme Court's decision in Hall must also apply retroactively, to the extent it merely represents an application or clarification of the Atkins decision.  If Hall did not announce a "new rule of constitutional law," Mr. Henry does not meet the statutory criteria for filing a second or successive habeas corpus petition under § 2244(b)(2)(A).  But the rule in Hall would apply retroactively to habeas petitioners in collateral review proceedings other than those seeking authorization to file second or successive habeas corpus petitions.  Which brings me back to why the procedural context of Mr. Henry's case supports the conclusion the rule announced in Hall applies retroactively.

After Atkins was decided, the Florida Supreme Court adopted Florida Rule of Criminal Procedure 3.203 as a mechanism for determining whether a defendant's intellectual disability barred imposition of the death penalty. See Amendments to Florida Rules of Criminal Procedure and Florida Rules of Appellate Procedure, 875 So. 2d 563 (Fla. 2004).  Rule 3.203(d)(4)(F) as originally adopted specifically provided that prisoners in Mr. Hall's procedural posture could file a successive motion for collateral relief in state court to assert an Atkins claim:

29

> If a death sentenced prisoner has filed a motion for postconviction relief, the motion has been ruled on by the circuit court, and that ruling is final on or before October 1, 2004, the prisoner may raise a claim under this rule in a successive rule 3.851 motion filed within 60 days after October 1, 2004. The circuit court may reduce this time period and expedite the proceedings if the circuit court determines that such action is necessary.

Id. at 571. Mr. Hall availed himself of this procedure by timely filing a successive postconviction motion. His postconviction motion was denied after an evidentiary hearing. Mr. Hall then appealed the denial of relief to the Florida Supreme Court arguing, among other things, "that his IQ should be read as a range of scores from 67 to 75 and th[e] [Florida Supreme] Court's adoption of a firm cutoff of 70 or below to qualify as mentally retarded misapplies the Supreme Court's ruling in Atkins." Hall v. State, 109 So. 3d 704, 707 (Fla. 2012). The state court rejected his argument and affirmed the denial of relief. Id. at 707–08, 711. It was in this context, undeniably collateral review, that the United States Supreme Court held that Florida's "rigid rule . . . creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." Hall, 134 S. Ct. at 1990.

The postconviction context of the Court's decision in Hall tells us that, at a minimum, the Supreme Court intended its holding to apply retroactively to all cases on collateral review. We are all familiar with the Supreme Court's holding in Teague that "[u]nless they fall within an exception to the general rule, new

30

constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."[2]  489 U.S. at 310, 109 S. Ct. at 1075.  In Teague, a federal habeas petitioner urged the adoption of a new rule in his case: that the Sixth Amendment's fair cross section requirement applies to the petit jury.[3]  Id. at 299, 109 S. Ct. 1069.  Because the Court held that the new rule urged by the "petitioner should not be applied retroactively to cases on collateral review, [the Court] decline[d] to address [his] contention."  Id. In doing so, the Court explained that "were [it] to recognize the new rule urged by petitioner in this case, [it] would have to give petitioner the benefit of that new rule even though it would not be applied retroactively to other similarly situated."  Id. at 315, 109 S. Ct. at 1078.  To avoid treating similarly situated defendants differently, the Court adopted what it called "a more principled way of dealing with the [retroactivity] problem" in the collateral review context.  Id. at 316, 109 S. Ct. at 1078.  It will "simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others

---

[2]  I read the Supreme Court's decision in Hall as being more substantive than procedural because it expands the class of persons who are categorically ineligible for the death penalty.  This is another reason the Hall decision applies retroactively on collateral review.  "New substantive rules generally apply retroactively."  Schriro v. Summerlin, 542 U.S. 348, 351, 124 S. Ct. 2519, 2522 (2004).

[3]  In Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692 (1975), the Supreme Court expressly held that the Sixth Amendment's fair cross section requirement does not apply to the petit jury.  Id. at 538, 95 S. Ct. at 701.  Nonetheless, the petitioner in Teague contended "that the ratio decidendi of Taylor cannot be limited to the jury venire, and he urge[d] the adoption of a new rule."  Teague, 489 U.S. at 299, 109 S. Ct. 1069.

31

similarly situated." Id.  Consistent with this policy, we have noted the Supreme

Court "rarely, if ever, announces and retroactively applies new rules of

constitutional criminal procedure in the postconviction context."  In re Perez, 682

F.3d 930, 933 (11th Cir. 2012) (per curiam).  It stands to reason then, to the extent

the Supreme Court did announce a new rule in Hall, it intended for that rule to

apply retroactively to all persons on collateral review.  After all, the Supreme

Court applied the new rule to Mr. Hall, a prisoner whose case became final long

before Atkins was decided.   Hall, 134 S. Ct. at 2001.   It would be passing strange,

and contrary to everything the Supreme Court has told us about retroactivity, if the

rule in Hall only applied to Mr. Hall's collateral review proceedings and not to

other defendants' collateral review proceedings.  Hall's case is currently on

remand to the Florida Supreme Court.

## B.

There is another reason the rule announced in Hall should be applied

retroactively to all cases on collateral review.  That is because the rule is more

substantive than procedural.  "When a decision of th[e] [Supreme] Court results in

a 'new rule,' that rule applies to all criminal cases still pending on direct review,"

but "[a]s to convictions that are already final, however, the rule applies only in

limited circumstances."  Summerlin, 542 U.S. at 351, 124 S. Ct. at 2522.  One of

those exceptions is that "[n]ew substantive rules generally apply retroactively."  Id.

32

The Supreme Court has taught us that "[a] rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." Id. at 353, 124 S. Ct. at 2523. "In contrast, rules that regulate only the manner of determining the defendant's culpability are procedural." Id. My consideration of the Supreme Court's distinction between substantive and procedural rules in Summerlin persuades me that Hall is substantive because "it alters . . . the class of persons that the law punishes." Before Hall, capital defendants with IQ scores above 70 in Florida could not be considered intellectually disabled. After Hall, defendants with IQ scores above 70 may be considered intellectually disabled under Atkins. And as Atkins held, persons with intellectual disability may not be executed. Atkins, 536 U.S. at 321, 122 S. Ct. at 2252. Hall is substantive because it grew the class of people who are not eligible for the death penalty. The Hall opinion did not merely address the procedural method for determining who is intellectually disabled.

Indeed, Hall could not have been more clear that Florida's substantive requirement of an IQ test score of 70 or less "creates an unacceptable risk that persons with intellectual disabilities will be executed, and thus is unconstitutional." Hall, 134 S. Ct. at 1990. This reason is significant in light of the Supreme Court's explanation in Summerlin for why substantive rules apply retroactively: "[s]uch rules apply retroactively because they necessarily carry a significant risk that a

33

defendant . . . <u>faces a punishment that the law cannot impose upon him</u>."  542 U.S. at 352, 124 S. Ct. at 2522–23 (quotation marks omitted) (emphasis added).  It follows that the rule in <u>Hall</u> is substantive and applies retroactively because it addresses a "significant risk that a defendant . . . faces a punishment that the law cannot impose upon him."  <u>Id.</u>  It is undeniable that the Court's holding in <u>Hall</u> invalidated part of Florida's substantive definition for intellectual disability.  In doing so, the Supreme Court expanded the definition of intellectual disability and along with it the class of defendants who are not eligible to be executed under <u>Atkins</u>.

C.

The Supreme Court certainly did not expressly say anything in <u>Hall</u> about whether its holding was retroactive.  The word retroactive never even appears in the opinion.  But the rules do not require the Court to say anything about retroactivity in order for its rule to apply retroactively to cases on collateral review for the purposes of § 2244(b)(2)(A).  Justice O'Connor explained "more fully the circumstances in which a new rule is made retroactive to cases on collateral review by the Supreme Court" for the purposes of § 2244(b)(2)(A).  <u>Tyler v. Cain</u>, 533 U.S. 656, 668, 121 S. Ct. 2478, 2485 (2001) (O'Connor, J., concurring) (quotation marks omitted).  In <u>Tyler</u>, Justice O'Connor said:

> It is only through the holdings of this Court, as opposed to this Court's dicta and as opposed to the decisions of any other court, that a

34

new rule is "made retroactive . . . by the Supreme Court" within the meaning of § 2244(b)(2)(A).  The clearest instance . . . in which we can be said to have "made" a new rule retroactive is where we expressly have held the new rule to be retroactive in a case on collateral review and applied the rule to that case.  But, as the Court recognizes, a single case that expressly holds a rule to be retroactive is not a <u>sine qua non</u> for the satisfaction of this statutory provision.  This Court instead may "ma[k]e" a new rule retroactive through multiple holdings that logically dictate the retroactivity of the new rule.  To apply the syllogistic relationship described by Justice BREYER, if we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review.  In such circumstances, we can be said to have "made" the given rule retroactive to cases on collateral review.

<u>Tyler</u>, 533 U.S. at 668–69, 121 S. Ct. at 2485–86 (citations omitted).  The Majority acknowledges Justice O'Connor's concurring opinion in <u>Tyler</u> on this subject.  <u>See</u> Maj. Op. at 16–17.  However, I believe the Majority has moved too quickly, in the span of less than three weeks, to conclude that "no combination of Supreme Court holdings compels the conclusion that <u>Hall</u> is retroactive to cases on collateral review."  Maj. Op. at 18.

And there is more.  Justice O'Connor has taught us that "[i]t is relatively easy to demonstrate the required logical relationship [for automatic retroactivity] with respect to the first exception articulated in <u>Teague</u>."  <u>Tyler</u>, 533 U.S. at 669, 121 S. Ct. at 2486.  Under <u>Teague</u>'s first exception, "a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct

35

beyond the power of the criminal law-making authority to proscribe." Id. (quotation marks omitted). Thus, "[w]hen the [Supreme] Court holds as a new rule in a subsequent case that a particular species of primary, private individual conduct is beyond the power of the criminal lawmaking authority to proscribe, it necessarily follows that th[e] [Supreme] Court has 'made' that new rule retroactive to cases on collateral review." Id. But it is important to understand how Teague's first exception applies in the context of the death penalty in order to understand that the first exception also means Hall applies retroactively.

In Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989), abrogated on other grounds by Atkins, 536 U.S. 304, 122 S. Ct. 2242, the Supreme Court recognized that "a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all." Id. at 330, 109 S. Ct. at 2953. Said another way, Penry held "the first exception set forth in Teague should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." Id. Under this broadened understanding of Teague's first exception, Penry explained that if the Supreme Court "held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures

36

followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review." Id. Indeed, the Majority recognizes that the holdings in Penry and Atkins, when taken together, leave "no question that the new constitutional rule abstractly described in Penry and formally articulated in Atkins is retroactively applicable to cases on collateral review." Maj. Op. at 18 (quoting In re Holladay, 331 F.3d 1169, 1172 (11th Cir. 2003)). But the Majority stops short of finding that Hall is retroactive because it says "there are no Supreme Court cases . . . that necessarily dictate that the Hall rule is retroactive." Id. The Penry principle does not apply here, the Majority explains, "because Hall merely provides new procedures for ensuring that States do not execute the intellectually disabled." Id. at 16–17. I part ways with the Majority on this point.

One problem with the Majority's analysis is that it ignores the substantive nature of the Court's ruling in Hall. Again, Hall modified Florida's substantive definition for determining intellectual disability, not just its procedures. This much is clear from Hall itself: "The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of Atkins." Hall, 134 S. Ct. at 1993 (emphasis added). One of the principles the Justices were referring to was the Eighth Amendment principle that persons with intellectual disability may be tried and punished, but "[t]hey may not, however,

37

receive the law's most severe sentence." Id. The "Eighth and Fourteenth

Amendments to the Constitution forbid the execution of persons with intellectual

disability." Id. at 1990.

Just as Atkins can only be understood as a substantive limitation on the

power of the state to take a life, so too is Hall's substantive limitation on the power

of the state to define who is mentally retarded. Before Hall, Florida law defined

intellectual disability with a strict IQ cutoff of 70 or below, regardless of the

existence of deficits in adaptive functioning. After Hall, Florida must consider a

range of IQ scores along with deficits in adaptive functioning and evidence of

developmental onset. The reason for the Supreme Court's intervention bears

repeating: application of Florida's "rigid rule . . . creates an unacceptable risk that

persons with intellectual disability will be executed." Hall, 134 S. Ct. at 1990.

### III.

Moving on from my questions about the correctness and propriety of the

Majority's holding on the issue of retroactivity, I must also address the merits of

Mr. Henry's case. Both the Florida Supreme Court and the Majority of this panel

rely on a recent report that was prepared by a panel of experts selected by the

Governor of Florida to asses Mr. Henry's fitness to be executed pursuant to

§ 922.07 of the Florida Statutes. See Henry v. State, No. SC14-1053, slip. op. at

4–7 (Fla. June 12, 2014); Maj. Op. at 5, 8–9, 22. Section 922.07 provides

38

procedures to be followed "[w]hen the Governor is informed that a person under sentence of death may be insane." Fla. Stat. § 922.07(1). Thus, when the Governor is so informed, the Governor appoints a commission of three psychiatrists "to examine the convicted person to determine whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her." Id. This statute addresses a question quite different from that of intellectual disability. Compare Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842 (2007), and Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595 (1986), with Hall, 134 S. Ct. 1986, and Atkins, 536 U.S. 304, 122 S. Ct. 2242. Florida Statute § 922.07(1) is designed to aid in the determination of whether the defendant is competent to be executed. See generally Ford, 477 U.S. at 410, 106 S. Ct. at 2602 ("The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane."). Nonetheless, in order to support its conclusion that Mr. Henry is not intellectually disabled, the Majority relies, in part, on the findings of those whose task was limited to a determination of Mr. Henry's competency to be executed. See, e.g., Maj. Op. at 23 ("psychiatrists unanimously concluded that Henry suffered from no intellectual disability as defined in DSM-5").[4]

---

[4] In any event, any opinion expressed by the Governor's panel of doctors would have been rendered consistent with then-existing Florida law. Thus, any prior evaluation—such as those of

39

I find the Florida Supreme Court's consideration of the Governor's competency-to-be-executed experts' findings and conclusions to be troubling for another reason as well.  Mr. Henry's motion for determination of intellectual disability, filed well before Hall was decided, was summarily denied by the state trial court without any evidentiary hearing.  Mr. Henry therefore was not provided an opportunity to test the reliability of the Governor's experts' opinions about his intellectual disabilities.  Thus, the experts' findings and conclusions with respect to Mr. Henry's intellectual disability have never been subjected to the crucible of adversarial testing.  In this way, Mr. Henry was not able to participate in the truth-seeking process for this question.  This raises well established due process concerns.  See Grannis v. Ordean, 234 U.S. 385, 394, 34 S. Ct. 779, 783 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard.").

Finally, I view the merits of Mr. Henry's intellectual disability claim differently than the Majority.  Based on the limited record before us, I cannot say there is no reasonable likelihood that Mr. Henry would benefit from the Supreme Court's decision in Hall.  Hall teaches us that Florida, by operation of its bright line IQ score of 70, created "an unacceptable risk that persons with intellectual disability will be executed" in violation of the Eighth Amendment.  Hall, 134 S.

---

Governor's panel contained in their written report to the Governor on May 16, 2014—would have been under a legal standard that has since been ruled unconstitutional in Hall.

40

Ct. at 1990.[5]  Before Hall, Mr. Henry had no Atkins claim under Florida law, regardless of any deficits in adaptive functioning or developmental onset he might have been able to show.  Florida courts would not have considered such evidence because his IQ score is above 70.  See  Hall, 134 S. Ct. at 1994 (citing Cherry v. State, 959 So. 2d 702, 713–14 (Fla. 2007)).  And before Atkins was decided in 2002, federal law did not bar the execution of intellectually disabled prisoners.  Indeed, before Atkins, the conventional wisdom was that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."  Atkins, 536 U.S. at 321, 122 S. Ct. at 2252.  Thus, I am reluctant to draw any adverse inferences from the fact Mr. Henry has not previously asserted that he was intellectually disabled.

---

[5] Yet another distinction between my reading of Hall and that of the Majority is the Majority's seeming insistence that Mr. Henry can make a prima facie claim of mental disability only if he shows an IQ score of less than 75.  Maj. Op. at 21–22.  While it is true Hall held that state courts must now consider the five point standard error of measure in assessing intellectual disability, Hall also recognized that "[i]ntellectual disability is a condition, not a number."  Hall, 134 S. Ct. at 2001.  I worry the Majority is establishing a new bright line cut off which fails to heed the Supreme Court's admonishment in Hall that "[c]ourts must recognize . . . that the IQ test is imprecise."  Id.  I do not suggest that IQ scores are not helpful.  They are.  "But in using [IQ] scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do . . . ."  Id.  That said, although Mr. Henry's 78 IQ score would produce a range of 73 to 83 when the standard error of measure is taken into account, he has also asserted in state court pleadings that his extensive mental health history and known deficits in adaptive functioning result in a level of functioning comparable to individuals with an IQ of less than 70.  This is a qualifying score.

At the same time, the evidence now before this Court that Mr. Henry is intellectually disabled is undeveloped.  Mr. Henry alleges that he is intellectually disabled but he does not support his application with affidavits from experts or other evidence saying that he is intellectually disabled.   Indeed, the only IQ score he has presented is a 78, from the mid-1980s.  But in the unique circumstances presented by this case, it is not reasonable to expect so much from him given the Supreme Court's recent conclusion that Florida's definition for determining intellectual disability was unconstitutional.  Governor Scott signed Mr. Henry's death warrant on May 2, 2014, at which time his execution was scheduled for Wednesday, June 18, 1014.   As the Majority explains, the Florida Supreme Court promptly issued a briefing schedule setting a deadline of May 19, 2014 for the completion of all proceedings in the state trial court.  Mr. Henry's counsel opted not to file anything and instead requested the Governor to make a determination about Mr. Henry's fitness under § 922.07 of the Florida Statutes.  The panel of experts selected by the Governor conducted a 170- minute clinical evaluation of Mr. Henry at the Florida State Prison and then issued a report on May 16, 2014, in which they opined Mr. Henry was competent to be executed.  On May 20, 2014, the Governor issued an executive order lifting the temporary stay of execution he had entered pursuant to § 922.07.  Seven days later, the United States Supreme Court decided Hall on May 27.

42

Just three days later defense counsel filed a motion for determination of intellectual disability in the state trial court as a bar to Mr. Henry's execution. The state trial court summarily denied Mr. Henry's motion without an evidentiary hearing because it was filed outside the Florida Supreme Court's scheduling order. Mr. Henry promptly appealed the denial to the Florida Supreme Court and asked them to reverse and remand for an evidentiary hearing to determine his intellectual disability based on Hall. On June 12, 2014, the Florida Supreme Court considered the merits of Mr. Henry's intellectual disability claim and denied his request for an evidentiary hearing. See Henry, No. SC14-1053, slip op. at 5–8.

Two days later, Mr. Henry filed the application to file the second or successive habeas corpus petition based on Hall now before us. See Emergency Motion for Leave to File Second or Successive Petition for Writ of Habeas Corpus and Request for Stay of Execution, In re: John Ruthell Henry, No. 14-12623 (11th Cir. June 14, 2014) (App.). Mr. Henry's application asserts that he is intellectually disabled and cannot be executed. App. at 4. He asserts that he has not previously been examined by an expert for the purpose of determining his intellectual disability. App. at 7. In support of his intellectual disability claim, Mr. Henry alleges the following:

> At the time of trial, Mr. Henry had a low intelligence and an IQ of 78. He has not had an IQ test since 1986. Mr. Henry also has poor adaptive functioning and social adjustment. Dr. Mosman testified that this began as a result of post-concussion syndrome and traumatic

43

brain injury sustained during a severely abusive childhood, which led to cognitive deficits. Mr. Henry lacks the capacity to translate his clinical IQ to real life situations due to a lack of understanding of basic social customs, poor abstract reasoning and logical thinking skills, and poor comprehension. He functions with a mental/developmental age of 13 or 14, equivalent to a person with an IQ of 70. Substance abuse exacerbated the poor level of functioning. Mr. Henry also suffered from delusions and hallucinations as early as age 10 that further hindered his adaptive functioning.

App. at 9. While these allegations do not clearly establish that Mr. Henry is intellectually disabled, they offer a basis finding that he is. Given the unique procedural posture of this case, the timing of the Supreme Court's intervening decision in Hall, and the fact that Mr. Henry asserts he has never had an evaluation by any expert to determine his intellectual disability, I cannot say there is no reasonable likelihood he could prove he is intellectually disabled under Hall.

On this record, I would grant Mr. Henry's request to file a second or successive habeas petition because I believe he should have one full and fair opportunity to litigate his intellectual disability claim.[6] In doing so, I am mindful

---

[6] I emphasize that it is not for me as appellate judge to determine at this juncture whether Mr. Henry is actually intellectually disabled. Rather, I am simply saying, as this Court did in In re Holladay, that in my view, "based on the facts presented and the procedural posture of this case petitioner should be permitted to file a second petition for a writ of habeas corpus on the basis of his [Hall] claim." 331 F. 3d at 1176. I understand the District Court would then have to decide for itself, with the benefit of full briefing and other appropriate procedures, whether Mr. Henry is entitled to relief. See Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1357 (11th Cir. 2007) (holding that after this Court grants a petitioner authorization to file a second or successive habeas petition under 28 U.S.C. § 2244(b)(3)(A), the district court must "determine for itself whether [the statutory] requirements are met"); id. at 1358 ("The statute puts on the district court the duty to make the initial decision about whether the petitioner meets the § 2244(b)

44

that all we need to decide in this type of proceeding is whether Mr. Henry has made "a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Holladay, 331 F.3d at 1173 (quotation marks omitted). Although this standard is not toothless, it is not a particularly high standard. Id. at 1174 (citing Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002) ("A prima facie showing is not a particularly high standard. An application need only show sufficient likelihood of satisfying the strict standards of § 2255[h] [which are the same standards that apply to state habeas petitioners] to warrant a fuller exploration by the district court." (footnote and quotation marks omitted)).

Given the Eighth Amendment's categorical bar against executing the intellectually disabled, and Mr. Henry's colorable showing that he may be intellectually disabled, he should have at least one opportunity to determine his intellectual disability under Hall. Cf. Johnson v. Mississippi, 486 U.S. 578, 584, 108 S. Ct. 1981, 1986 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." (quotation marks omitted)). "By protecting even those convicted of heinous crimes, the Eighth Amendment

---

requirements—not whether he has made out a prima facie case for meeting them, but whether he actually meets them.").

45

reaffirms the duty of the government to respect the dignity of all persons." Roper

v. Simmons, 543 U.S. 551, 560, 125 S. Ct. 1183, 1190 (2005); see also Trop v.

Dulles, 356 U.S. 86, 100, 78 S. Ct. 590, 597 (1958) (plurality opinion) ("The basic

concept underlying the Eighth Amendment is nothing less than the dignity of

man."). To facilitate Mr. Henry having this opportunity to develop his intellectual

disability claim, I would grant a stay of execution so he can litigate this claim in

the District Court.